**LEWIS BRISBOIS BISGAARD & SMITH LLP**
DAVID B. AVAKIAN (Nevada Bar No. 009502)
david.avakian@lewisbrisbois.com
6385 S. Rainbow Boulevard, Suite 600
Las Vegas, Nevada 89118
Telephone:     (702) 893-3383
Facsimile:      (702) 893-3789

**SCHEPER KIM & HARRIS LLP**
DAVID W. WILLIAMS (*pro hac vice* application pending)
dwilliams@scheperkim.com
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone:     (213) 613-4655
Facsimile:      (213) 613-4656

*Attorneys for Defendant sued as NARCONON*
*FRESH START d/b/a RAINBOW CANYON*
*RETREAT*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| RONALD MCCLURE, an Arizona Citizen; and JASON MCCLURE, an Arizona Citizen, <br><br> Plaintiffs, <br><br> vs. <br><br> NARCONON FRESH START d/b/a RAINBOW CANYON RETREAT, a California Corporation; ASSOCIATION FOR BETTER LIVING AND EDUCATION INTERNATIONAL; NARCONON INTERNATIONAL and DOES 1-100, ROE Corporations I — X, inclusive, <br><br> Defendants. | CASE NO. 2:14-cv-00995-JCM-CWH <br><br> **DEFENDANT'S NOTICE OF MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF** <br><br> ***Filed Concurrently with:*** <br><br> • ***Separate Statement of Undisputed Facts;*** <br> • ***Declaration of Shannon Farnsworth;*** <br> • ***Declaration of David Avakian, Esq.;*** <br> • ***Request for Judicial Notice*** |

TO THE CLERK OF THE COURT, ALL PARTIES, AND THEIR COUNSEL OF

RECORD:

PLEASE TAKE NOTICE that on _____, 2015, at 8:30 a.m., or as soon thereafter

as the matter may be heard, in the Courtroom of the Honorable James C. Mahan in the United

4847-4379-0377.2

1   States District Court, District of Nevada, located at 333 S. Las Vegas Blvd., Las Vegas, NV

2   89101, Defendant Narconon Fresh Start d/b/a Rainbow Canyon Retreat ("Fresh Start"), will, and

3   hereby does, move for Summary Judgment on Plaintiffs' Ronald McClure and Jason McClure's

4   claims for relief, on the ground that there are no triable issues of material fact as to any of

5   Plaintiffs' claims and causes of action in the case, and that Fresh Start is entitled to judgment as a

6   matter of law.

7         This motion is based upon this Notice of Motion and Motion, the concurrently filed

8   Memorandum of Points and Authorities, the concurrently filed Separate Statement of Undisputed

9   Facts, the concurrently filed Declarations of Shannon Farnsworth and David Avakian, Esq., the

10  concurrently-filed Request for Judicial Notice, and any other pleadings and papers on file in this

11  action, and such matters and argument as may be presented at the time of hearing.

12  DATED: October 1, 2015          LEWIS BRISBOIS BISGAARD & SMITH LLP

13                                   /s/ David B. Avakian
14                                  DAVID B. AVAKIAN
                                    Nevada Bar No. 009502
15                                  david.avakian@lewisbrisbois.com
                                    6385 S. Rainbow Boulevard, Suite 600
16                                  Las Vegas, Nevada 89118
                                    Attorney for NARCONON FRESH START
17  DATED: October 1, 2015          SCHEPER KIM & HARRIS LLP

18                                   /s/ David W. Williams
19                                  David W. Williams (Pro Hac Vice Pending)

20            **MEMORANDUM OF POINTS AND AUTHORITIES**

21  **I.   INTRODUCTION**

22        Plaintiffs' case is a "bait and switch" fraud case premised on the idea that the drug

23  rehabilitation program offered by Defendant Fresh Start is nothing more than a disguised version

24  of the Church of Scientology.  Now that discovery is closed, Plaintiffs' inflammatory allegations

25  are revealed as shams.  The failures of proof that litter Plaintiffs' case can be grouped into three

26  categories:

27        *No injury/No causation.*  Plaintiff Jason McClure disclaimed the very premise of the case,

28

1  confirming he was not subjected to Scientology or any other religious practice while at Fresh

2  Start.  Rather, the only injury he claims is that, after his time at Fresh Start, he started injecting

3  drugs (as opposed to the numerous and imaginative other ways he chose to ingest illegal drugs

4  before he attended Fresh Start).  This novel allegation is neither cognizable under law nor true:

5  Jason McClure admits that he started injecting because of his romantic interest in the women he

6  first injected drugs with and because he had destroyed his septum by inhaling cocaine for

7  numerous years, not because of anything Fresh Start did.

8       *No expert support.*  The core of Plaintiffs' case requires expert witness support – such as

9  their claim that Narconon is Scientology; diagnoses to link their alleged injuries to Fresh Start; and

10  the relevant duty of care.  But Plaintiffs have not designated any expert witnesses, and the deadline

11  to do so has long passed.  The lack of any expert opinion by itself dooms the guts of the case.

12       *Statements not Actionable.*  Plaintiffs lack evidence to show that Fresh Start's alleged

13  misrepresentations are actually false.  Indeed, the undisputed facts establish the *truth* of most of

14  the statements, including that the Narconon program is secular, that Jason would receive and did

15  receive individualized attention from licensed counselors, and the success rate of the program.

16  The same undisputed facts likewise show that Fresh Start honored its contract with Plaintiffs.

17  Likewise, the undisputed facts show that Plaintiffs did not rely on the remaining alleged false

18  statements, have no evidence of a culpable mental state, and repeatedly broke their own promises

19  to Fresh Start.

20  **II.    STATEMENT OF FACTS**

21      A.    The Narconon Program

22       The Narconon drug rehabilitation program was founded in 1966 by William Benitez, an

23  Arizona prison inmate, who reformed himself based on the practical application of the writings of

24  L. Ron Hubbard.  After his release from prison, and with Hubbard's help, Benitez developed the

25  program for other inmates, and eventually, for the general public.  The program is focused on

26  identifying and strengthening the abilities needed to gain positive, constructive skills useful to

27  battling addiction.

28       Narconon Fresh Start operates facilities in Nevada, California, Colorado, and Texas that

1    offer the Narconon program of drug rehabilitation. The program typically begins with an initial,

2    non-medical withdrawal process, including a medically-supervised detox for severe cases. The

3    medical doctor examines the student to verify if the student can be medically cleared for the

4    Narconon drug-free program. If the medical doctor feels he cannot give the student clearance for

5    a drug-free withdrawal, the student is sent to a separate facility for the medical detoxification

6    phase. Once the medical doctor clears the student for the drug-free program, the student is

7    transferred to the Narconon facility. After an initial course on communication techniques, the

8    students begin the New Life Detoxification Program (the "sauna program"), which involves

9    periods of sweating in a dry sauna and nutritional supplements, including doses of Niacin. After

10   the sauna program, students continue through additional courses, including: the Ups and Downs in

11   Life Course, which teaches students to identify social and anti-social characteristics so that they

12   may identify bad influences in their lives; the Personal Values and Integrity Course, which teaches

13   students the importance of being honest in their lives and the benefits of living in an ethical

14   manner; and the Changing Conditions in Life Course, in which students take specific actions to

15   repair the past and present conditions in their lives. The final course, called the "Way to

16   Happiness Course," helps introduce students to a common-sense moral code including precepts

17   such as: "be worthy of trust," "fulfill your obligations," and "try not to do things to others that you

18   would not like them to do to you." Finally, each student and his or her case supervisor develops a

19   life plan that incorporates the entire program, customized for the student's life and personal goals.

20   The program, which is self-motivated, lasts from 3 to 6 months depending on the students'

21   progress.

22        As stated in its websites and contracts with its students, Narconon Fresh Start's program is

23   secular and does not espouse the teachings of Scientology or any other religion. *See,* (Ex. C.)

24   Fresh Start does not require a license to operate as a drug rehabilitation facility in Nevada.

25   However, Fresh Start is a licensed drug and alcohol rehabilitation provider in all jurisdictions in

26   which a license is required, such as California. (Request for Judicial Notice, herein after "RJN"

27   (Burgoon) Ex.s T-V.) The Narconon program used by Fresh Start at its facility in Caliente,

28   Nevada is the same program used in Fresh Start's facilities in California. (Farnsworth Decl. ¶ 2-

1    3.).

2         The Narconon Program has a historical success rate of about 75%, which Fresh Start has

3    reported on its website.  (Ex. C.)  David Venemon, a former Fresh Start staff member whom

4    Plaintiffs have disclosed as one of their witnesses, testified that he was tasked by Fresh Start to

5    conduct follow-up on Fresh Start graduates to ascertain how their post-Fresh Start success.

6    Between February 7 and April 15, 2013, Mr. Venemon personally made over 291 phone calls to

7    Fresh Start graduates.  (Ex. Q at 211:16-212:8 & Ex. 12.)  He reported that "[o]ut of those 287 are

8    doing very well, only 5 have reverted to drugs and alcohol." (*Id.* 211:22-212:8 & Ex. 12.)  Based

9    on Mr. Venemon's study, Fresh Start's success rate is 98.6 percent.  (*See* Ex. Q & Ex. 12.)  Mr.

10   Venemon also testified that believed the historical 76 percent success rate was accurate, and that

11   he never saw anything to contradict the 76 percent success rate.  (Ex. Q at 193:5-17.)   Similarly, a

12   2013 peer-reviewed study confirmed the Narconon program's success rate.  (*See*, Request for

13   Judicial Notice, Ex. W (Richard D. Lennox, et al., *A Simplified Method for Routine Outcome*

14   *Monitoring after Drug Abuse Treatment*, 7 Subst. Abuse 155 (2013), available at

15   http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3782393.)  In that study, staff members contacted

16   77.1 percent of graduates.  (Ex. W at 162.)  The study authors found that 88% of graduates

17   contacted six months after discharge reported that they had not required additional rehab services

18   since graduation; 76% reported that they had not ingested any alcohol within the past 30 days; and

19   over 90% reported not using any illegal drugs within the past 30 days.  (Ex. W at 165.)

20        B.    Plaintiffs' Pre-Fresh Start Research and Communications with Dan Carmichael

21        Plaintiffs allege that on or about May 19, 2013, Ronald McClure spoke on the phone with

22   Dan Carmichael, an intake counselor at Fresh Start, about an appropriate rehabilitation facility for

23   Jason McClure.  (Pl.s Compl., Docket 1, ¶ 13.)  Plaintiffs allege that Carmichael represented that

24   Jason would be under the care of licensed medical professionals at Fresh Start (*id.* at ¶ 15); that

25   Jason would receive extensive counseling from highly trained addiction counselors (*id.* at ¶ 16);

26   that the treatment program at Fresh Start had more than a 76% success rate (*id.* at ¶ 18); that the

27   sauna program would reduce or eliminate Jason's drug cravings (*id.* at ¶ 19); and that the

28   Narconon program was secular and did not involve the practice or study of religion.  (*Id.* at ¶ 20.)

1    Ronald testified that he chose to send Jason to Fresh Start based on Carmichael's

2  representations that (1) Jason would be provided counseling; (2) Narconon was not a twelve-step

3  program; (3) Fresh Start was far away from Arizona; (4) Narconon did not involve the practice of

4  religion; and (5) there would be medical personnel available 24 hours a day.  (Ex. L at 109:7-16,

5  65:17-66:14, 100:3-5, 122:23-124:2.)

6    Candy Shipley, Jason's McClure's sister, and Linda McClure, Jason's mother, both went

7  to the Fresh Start website and reviewed its contents before making a decision to send Jason to the

8  program.  (Ex. N at 104:8-12; Ex. M at 131:4-6; and Ex. L at 99:14-18.)  Linda McClure testified

9  that in deciding to enroll Jason at Fresh Start, Plaintiffs required a program that was not religious,

10  not a twelve-step program, and that had counseling and medical treatment available.  (Ex. M at

11  89:2-18, 131:17-132:8, 129:25-130:9.)

12    Jason did not talk to any Fresh Start staff, did not conduct any research on Fresh Start,

13  never spoke to Mr. Carmichael, and had "never even heard of Narconon" before arriving at Fresh

14  Start.  (Ex. K at 255:14-17, 257:18-258:7.)  Instead, he "just showed up" at Fresh Start.  (*Id.* at

15  258:4-7.)  Jason also testified that he does not pay attention to the success rates of any

16  rehabilitation program.  (*Id.* at 214:10-13, 215:9-11.)

17    C.    Jason's Enrollment and Voluntary Departure From Fresh Start

18    On or about May 21, 2013, Plaintiffs signed intake documents and paid $33,000.00 for

19  Jason to attend Fresh Start.  (Ex. D.)  In pertinent part, in the intake documents Jason agreed:  that

20  he was entering the program of his own volition; to fully cooperate with the staff; to follow the

21  rules of the facility and the instructions of staff; that he would stay at the Narconon program until

22  he completed it; that he was wholly responsible for his own actions; and that he waived any right

23  to a refund.  (*Id.* at FSM0004, 0023.)  In relevant part, Fresh Start agreed:  to provide residential

24  drug and alcohol treatment to Jason; to administer the program as founded by Mr. Benitez based

25  on L. Ron Hubbard's drug rehabilitation technology; to provide Jason with a physical exam; and

26  to provide assistance with obtaining a doctor or dentist as needed.  (*Id.* at FSM0024.)

27    On May 23, 2013, before entering the Fresh Start facility in Caliente, Nevada, Jason

28  McClure saw a doctor to clear him for the program.  (Ex. E.)  Dr. Rogers performed a physical

1   examination of Jason McClure and determined that McClure was physically cleared to begin a

2   prescription-drug free detox.   (*Id.*)  In a health questionnaire, Jason noted that he had a broken

3   tooth (Ex. D at FSM0021.)  On or about June 2, 2013, Fresh Start staff arranged for Jason to see a

4   dentist so that he could get his broken tooth taken care of.  (Ex. K at 364:12-365:18.)  At no point

5   during his stay at Fresh Start did Jason suffer from a medical condition while at Narconon that

6   went untreated or for which he needed medical attention.  (Ex. N at 100:14-17).

7        Sean Griffin, a Fresh Start staff member for the past three years, has had a Registered

8   Addiction Specialist ("RAS") certification from the Breining Institute since approximately June

9   2013, and has a California alcohol and drug dependency certification.  (Ex. P at 29:10-30:10.)

10   Griffin had multiple one-on-one conversations with Jason about his reasons for doing drugs,

11   including his belief that he was unable to live up to Ronald's expectations, and his issue with

12   trying to buy people's friendships.  (Ex. P at 115:3-117:1.)  Jason's Fresh Start student file

13   corroborates Mr. Griffin's understanding of Jason's individualized issues.  (Ex. I.)

14        Jason is not familiar with the Scientology religion, its dogma or religious doctrine.  (Ex. K

15   at 414:4-10.)  Jason testified that Fresh Start did not try to indoctrinate or recruit him into

16   Scientology.  (*Id.* at 408:11-14.)  He did not know of any staff members at Fresh Start who were

17   Scientologists.  (*Id.* at 408:2-5, 7-9.)  He never attended a Scientology church while at Fresh Start,

18   nor was he ever asked to do so.  (*Id.* at 411:10-15.)  As part of the admission contracts, Jason

19   McClure executed a document acknowledging the Narconon Program's debt to L. Ron Hubbard:

20   "The Drug Rehabilitation technology used by the Narconon Program is based on the works of L.

21   Ron Hubbard, founder of the Scientology Religion."  (Ex. D at FSM0036.)

22        Jason attended Fresh Start from May 21, 2013 until his voluntary departure on July 8,

23   2013.  (Ex.s F, G & H.)  Jason admitted that he violated the Student Rules he agreed to follow

24   when enrolling at Fresh Start, in particular by purchasing alcohol for his roommate.  (Ex. K at

25   301:22-303:1, 310:3-8, 310:13-17, 311:2-312:13, 433:2-434:18, 436:2-15 and 445:6-12.)

26        On July 7, during a leave of absence with his family, Jason secured his parents' consent

27   and permission to leave Fresh Start.  (Ex. K at 442:10-21.)  On July 8, Jason informed Fresh Start

28   that he had no intention of completing the program.  (Ex. P at 110:9-24.)  Also on July 8, Jason

1    signed a Voluntary Departure Form, acknowledging that he was leaving the program before

2    completing it; that he accepted full responsibility for leaving the program without completing it;

3    and that he waived his right to sue Fresh Start. (Ex. J; Ex. K at 444:1 - 448:8.)

4         D.     Plaintiffs' Claimed Injuries

5       In deposition, Jason testified that his only claimed injury in this case is that he started

6    injecting cocaine instead of snorting it once he left Fresh Start. (Ex. K at 186:1-8, 186:13-14

7    187:8-17, 438:22-24 and 468:13-17.) However, Jason's deposition testimony reveals a very

8    different story as to why he began injecting cocaine – reasons that had nothing to do with Fresh

9    Start whatsoever. Jason also expressly disclaimed that the case was about whether or not he was

10    converted to Scientology. (*Id.* at 438:16-18.)

11       Jason injected cocaine for the first time 37 days after leaving Fresh Start. (*Id.* at 95:24,

12    96:4.) He first injected cocaine from a woman named Sarah Brandon. (Ex. K at 9:11-18, 154:17

13    and 455:16-19.) He also injected cocaine with a woman named Katie. (*Id.* at 92:8-10, 154:12-15.)

14    Jason had met Ms. Brandon and Katie while they were all at Fresh Start; however, all three of

15    them had left Fresh Start when Jason started injecting drugs. (*Id.* at 458:4-8 and 440:13-18; *see*

16    *also id.* at 92:11-93:19 and 95:15-18.) Jason invited both Ms. Brandon and Katie to visit him, and

17    he paid for their travel expenses. (*Id.* at 439:8-10, 20-22.) When he invited Ms. Brandon to visit

18    him, Jason knew that she had relapsed onto drugs. (*Id.* at 439:23-440:3.)

19       Jason testified that he started "using IV drugs" because "Basically I lost my sense of

20    security with the auction and the wrecking yard." (Ex. K at 90:14-16.) (The McClure family

21    business is an auto wrecking yard.) Jason injected drugs with Ms. Brandon because he had a

22    romantic and sexual interest in her. (*Id.* at 96:15-21 and 440:4-8.) More importantly, Jason had so

23    badly destroyed his septum from years of prolonged cocaine use that he had no other choice but to

24    find another medium with which to abuse cocaine. (*Id.* at 109, 110, 143, 248 and 249.) Jason has

25    not sought medical or psychiatric care since leaving Fresh Start for any injury he allegedly

26    suffered at Fresh Start. (*Compare* Ex. K at 76:1-16 and 78:20-79:3 *with* Ex. O at 98:17 – 101:8

27    and 101:15-103:11.) Plaintiffs have not produced any documentary evidence linking Jason's any

28    physical or mental illness to Fresh Start. (Ex. S.)

E.    Plaintiffs Fail to Offer Any Expert Support For Their Case

The deadline for initial expert disclosures in this case was April 6, 2015, and the deadline for rebuttal experts was July 24, 2015.  (Dkt. No. 37, 4/7/15.)  Plaintiffs did not identify any experts or rebuttal experts.  (Avakian Decl. ¶ 4.)

III.    **ARGUMENT**

"Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).  Fresh Start satisfies its burden on summary judgment "merely by pointing out there is an absence of evidence to support the nonmoving party's case."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Thereafter, the burden shifts to Plaintiffs to raise a genuine issue for trial.  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000).  Where an essential element of a claim is not present, summary judgment is appropriate.  *See Nevada Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1414 (D. Nev. 1995).

A.    Jason McClure's Alleged "Physical" Injuries Were Not Caused by Fresh Start.

Plaintiffs' claims require proof of damages caused by Fresh Start's conduct.[1]  Jason McClure did not pay for the Fresh Start program – his father, Ronald McClure did – thus his only potential damages related to any claim are physical or mental. But Jason did not suffer his alleged injuries until after he left Fresh Start, and those injuries resulted from *his own* conduct and the conduct of third parties.

When asked what injuries he claims to suffered as a result of his time at Fresh Start, Jason

_____

[1] *See Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 446-47 (1998) (common law fraud); *Ideal Elec. Co. v. Flowserve Corp.*, 357 F. Supp. 2d 1248, 1255 (D. Nev. 2005) (negligent misrepresentation); *Laguerre v. Nev. Sys. Of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011) (breach of contract); *Bower v. Harrah's Laughlin, Inc.*, 125 Nev. 470, 491 (2009) (negligence); *Scialabba v. Brandise Const. Co.*, 112 Nev. 965, 968 (1996) (negligence); *Anderson v. Baltrusaitis*, 113 Nev. 963, 965 (1997) (negligence per se); *Dillard Dep't Stores, Inc. v. Beckwith*, 115 Nev. 372, 378 (1999) (intentional infliction of emotional distress); *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (RICO); *Sattari v. Washington Mut.*, 475 F. App'x 648, 648 (9th Cir. 2011) (statutory consumer fraud).

1   repeatedly made clear that his *only* claimed injury was that he started injecting cocaine instead of

2   snorting it.  (J. McClure Dep. 438:22-24 (basis of lawsuit was "that I started shooting – shooting

3   cocaine because of me going to Narconon"); *see also id.* 186:1-8, 186:13-14 (repeating that his

4   injury was his "starting to use IV drugs after Narconon."), 468:13-17.)  Plaintiffs do not claim or

5   offer evidence that Jason suffered any injuries due to the alleged lack of medical supervision at

6   Fresh Start, that he was injured by the sauna program, or that he was "converted" to Scientology.

7   Jason was emphatic about the latter point in deposition, testifying, "What's the basis of this

8   lawsuit? *It's not – it's not – it's not* whether I got turned into a Scientologist or not."  (J. McClure

9   Dep. 438:16-18, emphasis added.)  Jason's testimony further establishes that his sole injury was

10  caused *by third parties*; *after* he left Fresh Start; and for *reasons* unrelated to Fresh Start.

11              1.      Jason's Injuries Were Caused By the Criminal Acts of Third Parties

12              "When a third party commits an intentional tort or crime, the act is a superseding cause,

13  even when the negligent party created a situation affording the third party an opportunity to

14  commit the tort or crime."  *Bower*, 125 Nev. at 492.  Here, Jason explained in deposition that he

15  first injected drugs with Sarah Brandon, and that "She actually stuck the needle in my arm."  (Ex.

16  K at 154:17.)  Ms. Brandon's act of administering illegal drugs to Jason is just the type of

17  "intentional tort or crime" that breaks any possible causal chain between Fresh Start and Jason's

18  drug injections.  Moreover, *Jason* created the situation allowing Ms. Brandon to first inject him.

19  He invited Ms. Brandon to visit him, (*see, e.g., id.* 439:5 ("Sarah I did invite to my house,

20  yeah.")), and he paid her travel expenses – and likewise invited "Katie" (with whom he also

21  injected drugs) to visit him and paid for her travel.  (*Id.* at 439:8-10, 20-22.)  Moreover, Jason

22  knew that Ms. Brandon had relapsed when he invited her to visit him.  (*Id.* at 439:23-440:3, *see*

23  *esp.* 440:2-3 ("I think I talked to Sahara [sic] and she said she did, yeah.").)  Fresh Start cannot be

24  held liable for Ms. Brandon's conduct, especially when Jason paid her to visit him, *knowing* she

25  had relapsed.

26              2.      Jason's Injuries Occurred Well After He Left Fresh Start

27              When asked when he started injecting drugs, Jason admitted that "Everything IV drug was

28  *after Narconon.*"  (Ex. K at 79:19-20, *emphasis added.*)  More specifically, Jason twice testified

1  that he first injected cocaine for the first time 37 days after leaving Fresh Start. (*Id.* at 95:24,

2  96:4.) Because Jason had nothing to do with Fresh Start for over a month before he first suffered

3  his alleged injury, Fresh Start cannot be the "cause in fact" of Jason's intravenous drug use.

4  *Bower*, 125 Nev. at 491.

5       B.    <u>Plaintiffs' Fraud and Negligent Misrepresentation Claims Fail as a Matter of Law.</u>

6       Plaintiffs must prove the following elements of fraudulent misrepresentation, "by clear and

7  convincing evidence:  (1) A false representation made by defendant; (2) defendant's knowledge or

8  belief that its representation was false or that defendant had an insufficient basis of information for

9  making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting

10  upon the misrepresentation; and (4) damage to plaintiff as a result of relying on the

11  misrepresentation." *Barmettler*, 114 Nev. at 446-47.  Similar elements obtain for negligent

12  misrepresentation, except that the scienter element is replaced by the element that "the defendant

13  failed to exercise reasonable care or competence in obtaining or communicating the information."

14  *Ideal Elec. Co.*, 357 F. Supp. 2d at 1255.

15       Plaintiffs allege misrepresentations by Dan Carmichael to Ronald McClure that:  (1) the

16  Narconon program has a 76% success rate; (2) the Narconon program is secular; (3) Jason would

17  receive counseling related to substance abuse at Fresh Start; (4) that the sauna program is safe and

18  effective in reducing or eliminating drug cravings; and (5) Jason would be under the care of

19  licensed medical professionals at Fresh Start.  (Compl. ¶¶ 53, 54, 65, 66.)  Plaintiffs' claims fail

20  due to lack of evidence of reliance, falsity, materiality, or any culpable mental state.

21       1.    <u>Jason Cannot Establish Reliance on Any Alleged Misrepresentations.</u>

22       "Reliance on alleged misrepresentations presumes that a plaintiff has actually read or heard

23  those alleged misrepresentations in order to plead a cause of action for deceit." *Nevada Power*

24  *Co.,* 891 F. Supp. at 1414 (granting summary judgment on fraud claim because plaintiff's

25  employees had not read or heard alleged representations).  Here, Jason did no research about Fresh

26  Start, had "never even heard of Narconon" before arriving at Fresh Start, and did not even know

27  who Mr. Carmichael *was*, let alone hear any of Carmichael's representations.  (Ex. K at 255:14-

28  17, 257:18-258:7.)  Because Jason did not hear any of the alleged misrepresentations and did not

1   play any role in selecting Fresh Start, he could not have relied upon them, and his fraud-based

2   claims fail.

3           2.      Plaintiffs' Claims Based on Representations About Narconon's Success
                    Rate Fail.

4
                    (a)     All evidence confirms Narconon's 76 percent success rate as true.
5

6       Plaintiffs must present clear and convincing evidence that Fresh Start made a false

7   representation. *Daou v. Abelson*, 2014 WL 939086, at * 5 (D. Nev. Mar. 10, 2014); *Barmettler*,

8   144 Nev. at 446-47.  Plaintiffs have no evidence that the success rate is not 76 percent.  Plaintiffs

9   did not produce any documents in discovery undercutting Narconon's success rate or establishing

10  an alternative success rate.  Nor have they designated or produced any expert testimony about

11  Narconon's "true" success rate.

12      Plaintiffs also lack foundation for their belief that Narconon's success rate is not 76

13  percent.  Jason never researched Narconon's success rate and did not believe the success rate of

14  any rehabilitation program.  (J. McClure Dep. 258:14-25.)  Ronald testified that Mr. Carmichael

15  told him that Narconon's success rate was "about 72 percent" and that "typically it's about 76

16  percent."  (Ex. L at 184:23-185:3.)  When asked if he had any research to suggest that those

17  numbers are not correct, Ronald admitted that the he had not.  (*Id.* 185:6-11 ("The only research I

18  have is I went and met with The Meadows in Wickenburg," which is not a Narconon facility);

19  35:25-36:3, 100:6-12.)

20      Indeed, one of Plaintiffs' own witness, Mr. Venemon, confirmed that Fresh Start's success

21  rate was *at least* 76 percent rate.  Not only did he testify that he believed the 76 percent number

22  was accurate and that he never saw any information to undercut it, his own telephone survey of

23  nearly 300 Fresh Start graduates revealed that only five graduates relapsed, showing a success rate

24  of almost 99 percent.  (Venemon Dep. 211:16-212:8 & Ex. 12.).  Peer-reviewed literature, such as

25  Richard D. Lennox, et al*., supra*, showed success results in line with, and generally higher than, 76

26  percent.  Because Plaintiffs have not shown that the alleged statements about Fresh Start's success

27  rate are false, summary judgment is appropriate.

28                  (b)     Plaintiffs did not rely on statements about Narconon's success rate.

1   "Justifiable reliance upon an alleged misrepresentation is established when a plaintiff

2   shows:  'The false representation must have ***played a material and substantial part in leading the***

3   ***plaintiff to adopt his particular course;*** and when he was not in any way influenced by it, and

4   would have done the same thing without it for other reasons, his loss is not attributed to the

5   defendant.'"  *Nevada Power Co.,* 891 F. Supp. at 1414 (quoting *Blanchard v. Blanchard*, 108 Nev.

6   908 (1992)) (emphasis original); *see also Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 111 (1992)

7   (affirming summary judgment when plaintiff did not base his decision on the alleged

8   misrepresentation).  Such is the case here.

9       Ronald chose to send Jason to Fresh Start based on representations that (1) Jason would be

10   provided counseling; (2) Narconon was not a twelve step program; (3) Fresh Start was far away

11   from Arizona; (4) Narconon was secular; and (5) there would be medical personnel available 24

12   hours a day.  He never testified that he decided to enroll Jason at Fresh Start because of the

13   success rate.  Jason, for his part, testified that success rates don't mean anything to him and he

14   does not pay attention to the success rates of any rehabilitation program.  Thus, even if Plaintiffs

15   had evidence of falsity, reliance is absent and summary judgment is appropriate. [2]

16           3.   <u>Plaintiffs Cannot Premise Their Claims on Alleged Representations About</u>
        <u>the Safety or Effectiveness of the Sauna Program.</u>

17
18           (a)   Plaintiffs have offered no evidence that the sauna program is not
                safe and effective.

19       Plaintiffs did not produce any documents in discovery establishing the sauna program is

20   dangerous or ineffective, nor have they designated or produced any expert testimony on this topic.

21   Although Jason claimed that the sauna program gave him "no benefit whatsoever," (J. McClure

22   Dep. 346:3-4), his testimony demonstrates the sauna program was effective for him.  Jason

23   confirmed that the sauna program "helps to detoxify your system of any harmful chemicals," (*id.*

24   348:8-13) and that after the sauna program he slept better, his thought process was clearer, his

25   _____

26   [2] Although not a plaintiff in this action, Linda McClure corroborates that Ronald did not rely on Narconon's stated
      success rate.  She testified that in deciding to enroll Jason at Fresh Start, they required a program that was not

27   religious, not a twelve step program, and that had counseling and medical treatment available.  (L. McClure Dep.
      89:2-18, 131:17-132:8, 129:25-130:9.)

28

1   body physically felt better, his thoughts, memory, skin tone, and overall alertness were all "much

2   stronger." (*Id.* 351:20-352:21.)  He also confirmed that after the sauna program he hadn't thought

3   about drugs for almost a month.  (*Id.* 354:11-355:8.)  Thus Jason's own testimony confirmed that

4   the sauna in fact reduced his drug cravings – completely contradicting the allegations in the

5   complaint that Fresh Start *lied* to plaintiffs when it asserted that the sauna could reduce drug

6   cravings. (*E.g.,* Compl. ¶ 19.)

7                    (b)        Plaintiffs have no evidence that they heard or relied on any alleged
                               representation about the safety or efficacy of the sauna program.
8

9          In deposition Ronald stated only that Carmichael told him there was a sauna component to

10  the Narconon program.  Ronald did not testify that he was told anything about the purpose or

11  efficacy of the sauna program, or that he relied on those statements in sending Jason to Fresh

12  Start.[3] (R. McClure Dep. 123:13-19 ("When he gets out of that [detoxification], then we get into

13  the sauna.  And during the sauna or after the sauna, we have professional counselors that are here

14  and they will counsel him.").)  Thus, Plaintiffs have failed to show that any representation about

15  the safety and efficacy of the sauna program was made, that it was false, or that they relied on it,

16  and the representation cannot support a fraud claim as a matter of law.

17                   4.        Plaintiffs Cannot Base Their Claims on the Alleged Misrepresentation That
                               the Narconon Program is Secular.
18
                     (a)        Plaintiffs have no evidence that Narconon is a religious program.
19

20         Plaintiffs cannot provide any evidence that Narconon is a religious program that involves

21  worship in the Church of Scientology.  Plaintiffs have not offered any expert opinion on this topic,

22  despite Plaintiffs' counsel's assertion in similar cases that expert opinion is required.  (*See, e.g.,*

23  M. Tarr Dep. 106:12-17 ("Q:  Mr. Tarr, do you think that if Narconon uses some practices that are

24  also used in the church of Scientology, that means doing those practices is a religious exercise?

25  MR. HAMILTON:  Objection, calls for expert opinion.").)

26  _____

27  [3] Linda corroborated that statements made about the sauna program were not material in the decision to send Jason to
    Narconon.  (L. McClure Dep. 89:2-18, 131:17-132:8, 129:25-130:9.)

28

1      Nor are any of the indicia of a "religious" program present at Fresh Start.  Despite

2  Plaintiffs' allegations that Fresh Start proselytized to Jason and used "Narconon's rehabilitation

3  services as a religious exercise and recruitment vessel," (Dkt. No. 11 at 10-11, 17), Jason

4  disclaimed that the case was about Scientology and does not even know what Scientology *is*:

5  when asked "Is there anything you can tell me about Scientology?," he answered, "No."  (J.

6  McClure Dep. 414:4-6; *see also id.* 414:7-10; 413:23-414:3.)  Jason testified that Fresh Start did

7  not try to indoctrinate or recruit him into Scientology; that he did not know any Fresh Start staff

8  who were Scientologists; and that he was never asked to attend or did attend any Scientology

9  services at Fresh Start.  Indeed, the un-contradicted testimony from Fresh Start staff members and

10  students was that there were no Scientology services at the Nevada facility or any efforts to recruit

11  persons to the Scientology religion.  Sean Griffin, who has been either a student or a staff member

12  at the Caliente facility for almost four years now, testified that he was unaware of any

13  Scientologists at the Caliente facility, or of any students who converted to Scientology as result of

14  the Narconon program.  (Ex. P at 32:22-33:5.)

15      At the end of the day, all that Plaintiffs have to support their contention that Narconon is

16  Scientology – the very heart of their case – is their uninformed say-so. When pressed as to his

17  basis for the belief that Narconon is Scientology, Ronald McClue admitted:  "I don't know.  I

18  mean I don't know.  I just know what I've been told by Jason and other people from Narconon

19  that were at Narconon." (*Id.* 113:21-114:3)  Jason, in turn, testified that he is "not familiar with

20  Scientology – religion… or specifics." (J. McClure Dep. 413:18-414:3; *see also id.* 414:4-10.)

21      In sum, Jason relied on unidentified hearsay statements from unidentified speakers in

22  forming his opinion that Narconon was Scientology, even though he does not know Scientology

23  and dogma or religious doctrines.  Ronald, in turn, relied on Jason's unsubstantiated belief that

24  Narconon was Scientology, and Linda relied on Ronald's belief.  None of these unsubstantiated

25  opinions creates a triable issue of fact as to whether or not Narconon is a religious program.

26              (b)      Statements about the religious or secular nature of Narconon are
                        non-actionable opinions.

27

28      "[E]xpressions of opinion as distinguished from representations of fact, may not be the

4847-4379-0377.2

1  predicate for a charge of fraud." *Clark Sanitation, Inc. v. Sun Valley Disposal Co.*, 87 Nev. 338,

2  341-42 (1971); *see also Bulbman*, 108 Nev. at 111 (opinions "are not actionable in fraud").  Here,

3  even assuming practices in Narconon are also used in the Scientology religion, mere similarity is

4  not enough to show that Narconon is religious.  A person who drinks wine is not for that reason

5  Catholic, nor is a person who has stopped drinking alcohol necessarily Muslim.  Similarly, both

6  Islam and Judaism prohibit the eating of pork, but avoiding pork for health purposes does not

7  necessarily make a person either Muslim or Jewish.  Similarly, while Plaintiffs allege that

8  Scientology uses a sauna program, sitting in a hot room for extended periods is not unique to

9  Scientology:  the Native American "sweat lodge" ceremony is "nearly universal among American

10 Indian tribes, from coast to coast and in Alaska, across Canada and Mexico today." *Rich v.*

11 *Woodford,* 210 F.3d 961, 962 (9th Cir. 2000).  The sweat lodge ceremony also involves

12 participants sitting in a small, heated structure for extended periods. *See Allen v. Toombs*, 827

13 F.2d 563, 569 n.5 (9th Cir. 1987) (describing sweat lodge ritual).  Yet Plaintiffs do not claim that

14 the sauna program unwittingly subjects Fresh Start students to Native American religious practice.

15       Recently, these issues were addressed at length in *Sedlock v. Baird*, which analyzed yoga

16 classes in a school district's physical education program.  235 Cal App. 4th 874, 879-80 (2015).

17 The yoga poses were all derived from Ashtanga yoga, which is set forth in a series of Hindu texts.

18 The court assumed that Ashtanga yoga was a religion. *Id.* at 886.  However, the court held that the

19 district's yoga program was not religious, because the program was "devoid of any religious,

20 mystical or spiritual trappings." *Id.* at 899.  Moreover, even though the court acknowledged that

21 the program might have "provide[d] access to" a religion, the court concluded that the plaintiffs'

22 contention that "[r]eligious intentions may develop *through* performance of religious rituals" was

23 without merit and "unpersuasive." *Id.* at 890, 892.

24       *Sedlock* teaches that (1) simply including program aspects derived from a religion does not

25 make a program religious; and (2) the possibility that practicing aspects derived from a religion

26 may lead participants to religious intentions does not make a program religious.  Plaintiffs'

27 "secularity" theory is based on the same assumptions *Sedlock* rejected: (1) that Narconon

28 incorporates Scientology practices; and (2) that graduates of the Narconon program are supposedly

"route[d] to the nearest [Scientology Church] for further services" if they "so desire[]." (Compl. ¶ 38.) But even if Plaintiffs had evidence to support their assumptions, they would be unable to show that Narconon *in fact* is religious or that it amounts to indoctrination in Scientology.  Rather, Plaintiffs' allegation that Narconon is "religious" is an opinion, and as *Sedlock* shows, an "unpersuasive" one.

5.   Plaintiffs Have no Evidence that Representations About Counseling at Fresh Start Were False, and the Undisputed Facts Prove Otherwise.

Plaintiffs claim Carmichael falsely represented that "Jason McClure would receive counseling related to substance abuse at Fresh Start." (Compl. ¶ 53.)  Plaintiffs offer no evidence of falsity.

The record shows that Jason in fact interacted with  Mr. Griffin, a certified drug counselor, about the issues underlying his drug use, including Jason's belief that he was unable to live up to Ronald's expectations, and his history of trying to buy people's friendships. (Ex. P at 115:3-117:1; FSM 0527).  Jason's testimony does not create an issue of fact as to whether or not he received counseling at Fresh Start.  Jason did not claim that no counseling whatsoever occurred; he merely identified issues that he did not discuss at Fresh Start.  (J. McClure Dep. 372:23-373:17 (identifying a dog attack, being run over by a mail truck, and his first break up with a girlfriend as "stuff that you don't talk about at Narconon").)  Jason's testimony does not contradict Mr. Griffin's testimony that he counseled Jason about the causes of his drug use.  Rather, it shows Jason's refusal to fully engage in the counseling provided to him.

6.   Plaintiffs' Claims Based on the Alleged Representation That Jason Could Receive Licensed Medical Care Fails.

It is important to note that no one claims that Fresh Start ever represented that it provided a "medical" drug rehabilitation program; in fact, Fresh Start's website makes clear that it does not use a medical modality in treating drug addiction.  (Ex. C.)  Rather, plaintiffs assert that they were told medical care would be available to Jason McClure, if necessary.  (Ex. M at 129:25-130:9 ("[b]asically I was concerned about him getting medical treatment.  . . . I wanted him to have a doctor available"); *see also id.* 182:17-20.)

1    The evidence demonstrates that medical care was available – and provided – to Jason while

2   at Fresh Start.  On May 23, 2013, Jason saw a doctor to ensure that he did not have any immediate

3   health concerns.  Another doctor performed a physical examination and cleared him to begin a

4   prescription drug free detoxification.  While at Fresh Start, Jason also saw a dentist to have a

5   broken tooth repaired.  Jason did not suffer from any medical condition that went untreated nor

6   does he allege any harm from a lack of or delay in receiving medical treatment.

7              7.    Plaintiffs' Fraud and Negligent Misrepresentation Claims Fail Because
                     They Have No Evidence of the Requisite Mental States.
8

9    Plaintiffs have no evidence that Fresh Start or Carmichael knew that Carmichael's alleged

10   statements at issue were false when made; therefore, summary judgment is appropriate as to

11   Plaintiffs' fraud claim.  *Nevada Power Co.*, 891 F. Supp. at 1414.  Similarly, Plaintiffs have no

12   evidence that Carmichael did not exercise reasonable care in obtaining or communicating any of

13   his alleged statements.  Tellingly, Plaintiffs elected not to depose Carmichael.  Therefore,

14   summary judgment is appropriate on the negligent misrepresentation claim.  *Copper Sands*

15   *Homeowners Ass'n, Inc. v. Copper Sands Realty, LLC*, 2013 WL 3270430, at *8 (D. Nev. Jun. 26,

16   2013) (granting summary judgment where plaintiffs offered no evidence to demonstrate a triable

17   issue as to whether defendants failed to exercise reasonable care or competence in obtaining or

18   communicating the information.).

19         C.    Plaintiffs' Breach of Contract and Implied Covenant Claims Fail

20              1.    Plaintiffs' Breach of Contract Claim Fails.

21    To state a claim for breach of contract, Plaintiffs must prove: (1) formation of a valid

22   contract; (2) performance or excuse of performance by the plaintiff; (3) material breach by the

23   defendant; and (4) resulting damages.  *Donnell v. Fid. Nat. Title Agency of Nevada, Inc.*, No. 2:07-

24   cv-00001, 2012 WL 1669421, at *8 (D. Nev. May 11, 2012) (citing *Bernard v. Rockhill Dev. Co.*,

25   734 P.2d 1238, 1240 (1987)); *see also Laguerre,* 837 F. Supp. 2d 1176 at 1180.

26              (a)    Plaintiffs Have No Evidence of a Breach.

27    Plaintiffs allege that Fresh Start breached the contract by (1) failing to provide drug and

28   alcohol treatment; and (2) providing Scientology in lieu of drug and alcohol treatment.  (Compl. ¶

4847-4379-0377.2

18

50.)  Plaintiffs have characterized their second theory by claiming Fresh Start "us[ed] Narconon's rehabilitation services as a religious exercise and recruitment vessel."  (Dkt. No. 11 at 10:19-21.) Plaintiffs have no evidence to support their theories.

Plaintiffs have not produced an expert or provided any testimony regarding what would constitute "drug and alcohol treatment," or any evidence that the Narconon program fails to meet their unidentified standard.  Plaintiffs recognize there are multiple drug and alcohol treatment models, as they testified that Jason was not interested in attending a twelve step program.  (Ex. L at 62:4-15, 63:5-11; Ex. K at 212:24-213:11.)  Furthermore, the Narconon program, which is the same in all locations, is fully licensed in all jurisdictions in which a license is required. Accordingly, the appropriate administrative bodies in those states have already determined that the Narconon program is a comprehensive drug and alcohol treatment program.[4]

The contract requires Fresh Start to provide "residential treatment to clients."  (Ex. D at FSM 0023.)  This is exactly what Fresh Start provided, and no witness testified otherwise.  In addition, after enrolling at Fresh Start, Jason was sober for 87 days.  (Ex. K at 12:14-13:2 and 96:1-5.)[5]  That was the longest period of time Jason had been sober in nearly a decade, further evidencing that Jason was given actual treatment.  (*Id.* at 403:5-12 (confirming in the nine years prior to Narconon he had not been able to achieve 50 days of sobriety), *see also id.* at 82:5-8 and 128:12-129:2.)  As for the allegation that the Narconon program is Scientology, Plaintiffs have no competent evidence, either through experts or lay witnesses, to support this assertion.  *See* section III(B)(4), *supra*.

Finally, Plaintiffs have no evidence that Fresh Start tried to recruit Jason into Scientology. The uncontroverted evidence proves the opposite:  No one tried to recruit Jason into Scientology

---

[4] As part of the licensure process in California, Narconon facilities are reviewed every two years by the State Department of Health Services ("DHS").  California Health and Safety Code § 11834.01(a).  This review includes a review of the content of the Narconon Program and interview of former students regarding their experience and impressions of the Program.  Ever since the licensure requirements came into effect, facilities using the Narconon Program in California have always passed their bi-annual licensure examination and have been permitted to operate as a drug rehabilitation facility.

[5] Later, Jason reported he only remained sober for 17 days after Fresh Start.  (*Id.* 449:18-23.)  Either way, this period of sobriety was the longest he had achieved in nearly a decade.

1    while he was at Fresh Start, and Jason expressly disclaimed that such an allegation was the basis

2    of this lawsuit.  *See* Section III(A), *supra.*

3         Where a defendant has performed its obligations under the agreement, an essential element

4    of a breach of contract claim is absent and summary judgment is appropriate.  *Keife v. Metro. Life*

5    *Ins. Co.*, 931 F. Supp. 2d 1100, 1105-1108 (D. Nev. 2013); *Donnell*, 2012 WL 1669421, at *8.

6    Such is the case here.

7                         (b)      Plaintiffs Cannot Show Their Own Performance.

8         To establish their claim for breach of contract, Plaintiffs must show that they performed or

9    were excused from not performing.  *Gowen v. Tiltware LLC*, 2009 WL 1441653, at * 4 (D. Nev.

10   May 19, 2009); *Donnell*, 2012 WL 1669421, at *8.  Here, the contract required Jason to abide by

11   Fresh Start's student rules of conduct and complete the program.  (Ex. H; *see also* Ex. K at 301:4-

12   21 & Ex. E to J. McClure Dep. at 223-228 (Student Rules of Conduct signed by Jason).)  Jason did

13   not do either: he violated the Student Rules by purchasing alcohol for another student, and he

14   voluntarily left the program early.  Jason's failure to perform defeats the breach claim.  *See,*

15   *Gowen*, 2009 WL 1441653, at *4.

16                         2.      Plaintiffs' Implied Covenant Claim Fails.

17        Plaintiffs base their claim for breach of the implied covenant on the following conduct:

18   "(1) having Jason McClure unwittingly study and practice Scientology in lieu of engaging in drug

19   treatment; (2) attempting to have Jason McClure surrender his legal rights in exchange for services

20   for which Plaintiffs had already provided consideration; and (3) persuading Ronald McClure to

21   send Jason to Fresh Start with promises that Narconon's sauna program would reduce or eliminate

22   his drug cravings by flushing toxins and then asking Jason at Fresh Start to sign an

23   acknowledgment that the sauna program is not a medical program and that it provides no physical

24   gains."  (Compl. ¶ 83.)  None of the alleged bases supports a claim for breach of the implied

25   covenant of good faith and fair dealing.

26        The first allegation – that Narconon is Scientology – is not supported by any evidence.

27   Moreover, even if Plaintiffs had such evidence, the alleged conduct would constitute a breach of

28   an express provision of the contract and thus would be superfluous to an implied covenant claim.

4847-4379-0377.2

1  *Careau & Co. v. Security Pacific Business Credit, Inc.,* 222 Cal.App.3d 1371, 1395 (1990)

2  (allegations that would constitute breach of express contract terms are superfluous when

3  evaluating implied covenant claim).

4      The second and third allegations are impossibly vague.  It is not clear what conduct

5  Plaintiffs allude to or how such conduct ties to the purposes of the express terms of the contract –

6  as is necessary for an implied covenant claim.  *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317,

7  349-50 (2000) (implied covenant "cannot impose substantive duties or limits on the contracting

8  parties beyond those incorporated in the specific terms of their agreement"); *Foley v. Interactive*

9  *Data Corp.*, 47 Cal. 3d 654, 690 (1988) (implied covenant "is read into contracts in order to

10  protect the express covenants or promises of the contract, not to protect some general public policy

11  interest not directly tied to the contract's purposes.").  Plaintiffs have not identified or presented

12  evidence of any conduct forming the basis of their "surrender [of Jason's] legal rights" allegation,

13  and necessarily do not point to any specific contractual provision that was frustrated as a result of

14  this unidentified conduct.  Plaintiffs' allegations about the sauna program are even weaker, as they

15  are not based on conduct during the contract period at all, but upon Carmichael's *pre-contractual*

16  representations to Ronald.  Because the implied covenant does not protect "general public policy

17  interest[s]" unrelated to the contract terms, *see Foley*, 47 Cal. 3d at 690, any purported

18  inducements to enter into the contract may only be addressed via Plaintiffs' fraud claim – which

19  fails as explained above.

20      D.    Plaintiffs' Negligence and Negligence Per Se Claims Fail

21          1.    Plaintiffs Cannot Establish the "Duty" or "Breach" Elements on Their
22                Negligence Claim.

23      On their claim for negligence, Plaintiffs must prove (1) defendant's legal duty toward

24  plaintiff; (2) defendant's breach of that duty; (3) injury to plaintiff as a result of that breach or

25  proximate cause; and (4) damage.  *Scialabba*, 112 Nev. at 968.  "Whether a defendant owes a

26  plaintiff a duty of care is a question of law."  *Id*.  Plaintiffs argue that Fresh Start breached a duty

27  of care by instructing Jason to sit in the sauna and take Niacin; failing to staff the facility with

28  medical personnel; failing to provide counselors; and providing Jason with Scientology in lieu of

21

1   substance abuse treatment.  But they do not provide any evidence to establish the duty element.

2         Claims of professional negligence – or any negligence claim where the duty at issue is

3   beyond the scope of lay witness knowledge - require expert testimony to establish a duty of care.

4   Fed. R. Evid. 702(a); *Feagins ex rel. Feagins v. Trump Org.*, 2013 WL 5676316, at *2 (D. Nev.

5   Oct. 17, 2013) ("As to the negligence claims, the mere happening of an accident does not prove

6   liability . . . .  [U]nder Nevada law, an expert is an indispensable part of a case where the conduct

7   at issue is beyond the common knowledge of lay persons.") (*citing Daniel, Mann, Johnson &*

8   *Mendenhall v. Hilton Hotels Corp.*, 98 Nev. 113, 115 (1982)).  Thus, where a plaintiff does "not

9   disclose an expert witness who could attest to breach of the standard of care," summary judgment

10   is appropriate.  *Dolmayan v. Doxey*, 2015 WL 5431966, at *1 (Nev. Sept. 10, 2015).

11         Plaintiffs allege that Fresh Start breached its duty of care in providing professional services

12   as a treatment facility.  (Compl. ¶¶ 58-59.)  More generally, the scope of a treatment facility's duty

13   of care is not a topic that lay witnesses are familiar with.  Accordingly, expert testimony is

14   necessary to establish the duty element – but Plaintiffs failed to name an expert to establish the

15   scope of the duty of care of a treatment facility, let alone whether that duty was breached.

16   Plaintiffs bear the burden of establishing all elements of their claim for relief.  Plaintiffs have not

17   even tried to do so here.  Plaintiffs cannot establish the duty or breach elements as a matter of law,

18   and Fresh Start is entitled to summary judgment.

19             2.    <u>Plaintiffs' Negligence *Per Se* Claim Lacks Any Legal or Factual Basis.</u>

20         To prove a claim for negligence *per se*, Plaintiffs must demonstrate (1) defendant violated

21   a statue, (2) the violation was the proximate cause of plaintiff's injuries, (3) the plaintiff belong to

22   the class of persons the statute was designed to protect, (4) plaintiffs injuries were the type against

23   which the statute was intended to protect, and (5) plaintiff suffered damages. *See Anderson*, 113

24   Nev. at 965; *Vega v. E. Courtyard Assoc.* 117 Nev. 436, 440-41 (2001).

25         Plaintiffs allege that Fresh Start practiced medicine without a license (and thus violated

26   NRS 630.160) by administering Niacin to Jason and allowing him to participate in the sauna

27   program.  (Compl. ¶ 70.)  Initially, Plaintiffs ignore the undisputed fact that Jason *was* cleared by a

28   licensed physician to participate in the sauna program.  Just as importantly, Plaintiffs have neither

1  law nor fact to support their contention that either the sauna program or simply administering

2  vitamins is the "practice of medicine."

3       Defendants have located no legal authority to support Plaintiffs' allegation that merely

4  giving someone vitamins constitutes the "practice of medicine," or that rehabilitation programs

5  constitute the "practice of medicine."  This is not surprising, because NRS 630.047(d) exempts

6  any "healing art" from the licensing requirements for the practice of medicine.[6]  Given the lack of

7  any legal authority for their position, at a minimum Plaintiffs need to present expert opinion as to

8  the difference between the practice of "healing arts" and the "practice of medicine," and that

9  Defendants' conduct was the practice of medicine.  Plaintiffs have not done so, as they have not

10 offered any expert witnesses in the case.  Thus, their claim lacks any factual basis.  Summary

11 judgment must be entered on the claim.

12       E.    Plaintiffs' Claim For Intentional Infliction of Emotional Distress Fails.

13       The elements of a claim for intentional infliction of emotional distress are (1) outrageous

14 conduct by the defendant, (2) the defendant's intention of causing, or reckless disregard of the

15 probability of causing, emotional distress, (3) the suffering of severe or extreme emotional distress

16 by the plaintiff, and (4) actual and proximate causation.  *Hernandez v. General Adjustment*

17 *Bureau*, 199 Cal.App.3d 99, 1007 (1988); *Dillard*, 115 Nev. at 378; *Miller v. Jones*, 114 Nev.

18 1291, 1299-1300 (1998).  "Outrageous" conduct "must be so extreme as to exceed all bounds of

19 that usually tolerated in a civilized society." *Cervantes v. J.C. Penney Co.*, 24 Cal.3d 579, 593

20 (1979); *see also Potter v. Firestone Fire & Rubber Co.*, 6 Cal.4th 965, 1004 (1993) (severe

21 emotional distress must be "of such substantial quality or enduring quality that no reasonable

22 [person] in civilized society should be expected to endure it.") (internal citations omitted).

23 Moreover, the intent element requires that the outrageous conduct "means more than the non-

24 accidental nature of the wrongful act.  That act must also be directed at the plaintiff or in the

25  _____

26 [6] NRS 630.0122 defines "healing art" as "any system, treatment, operation, diagnosis, prescription or practice for the
   ascertainment, cure, relief, palliation, adjustment or correction of any human disease, ailment, deformity, injury, or
27 unhealthy or abnormal physical or mental condition for the practice of which long periods of specialized education
   and training and a degree of specialized knowledge of an intellectual as well as physical nature are required."

28

1   presence of the plaintiff." *Smith v. Pust*, 19 Cal.App.4th 263, 274 (1993).

2            "[I]n cases where emotional distress damages are not secondary to physical injuries, but

3   rather, precipitate physical symptoms, either a physical impact must have occurred or, in the

4   absence of physical impact, proof of 'serious emotional distress' causing physical injury or illness

5   must be present." *Barmettler*, 114 Nev. 441 at 448.   In emotional distress cases, general physical

6   or emotional discomfort is insufficient to satisfy the physical impact requirement.   *Id.*   In the

7   absence of physical injury, a plaintiff must show some "objectively verifiable indicia of the

8   severity of his emotional distress." *Miller*, 114 Nev. at 1300.   Plaintiffs generally must produce

9   some medical or psychiatric records to satisfy the "objectively verifiable indicia" requirement.   *Id.*

10           Plaintiffs allege that Fresh Start's "outrageous" conduct was providing Jason with

11  Scientology in lieu of drug treatment or substance abuse counseling.   (Compl. ¶ 62.)   Plaintiffs

12  claim that because of this conduct "Jason McClure has suffered severe and extreme emotional

13  distress way beyond what any person in a civilized society should be expected to endure." (*Id.* ¶

14  63.)   The claim fails at the threshold, because there is no evidence that Jason was subjected to

15  Scientology, and Jason rejected any notion that this case is about his alleged exposure to

16  Scientology.   *See* Section III(A), *supra*.

17           Plaintiffs also fail to present any objective indicia that Jason suffered any emotional

18  distress.   Jason has not seen a primary care physician in at least six years, and he has not

19  voluntarily seen a psychiatrist since leaving Fresh Start.   Jason has seen doctors post-Fresh Start

20  for infections and hallucinations, (Ex. K at 76:1-16 and 78:20-79:3), but there is no diagnosis or

21  any other record evidence connecting those symptoms to emotional distress, let alone distress

22  caused by Fresh Start.     As to Ronald McClure, the alleged acts – the alleged *sub rosa* attempts to

23  convert Jason McClure – were neither directed towards Ronald nor occurred in his presence, thus

24  he has no claim.   *Smith v. Pust*, *supra*, 19 Cal.App.4th at 274.

25           Plaintiffs have no objective evidence of physical or emotional injury that is causally linked

26  to Jason McClure's attendance at the Fresh Start program.   *See Miller*, 114 Nev. at 1300

27  (affirming summary judgment where plaintiff "did not seek any medical or psychiatric assistance"

28  for his alleged distress and thus "presented no objectively verifiable indicia of the severity of his

1  emotional distress.")  Because Plaintiffs fail to present any evidence of outrageous conduct or

2  objective indicia of injuries cause by the alleged "outrage," summary judgment is appropriate.

3       F.    <u>Plaintiffs' RICO Claim Fails.</u>

4       A RICO violation "requires proof of '1) conduct 2) of an enterprise 3) through a pattern 4)

5  of racketeering activity.'"  *Howard v. America Online, Inc.*, 208 F.3d 741, 746 (9th Cir. 2000)

6  (quoting *Sedima S.P.R.L. v. Imrex Corp.*, 473 U.S. 479, 496 (1985)).  A "pattern" requires proof of

7  *at least* two instances of racketeering activity:  "Two acts are necessary, but not sufficient, for

8  finding a violation."  *Id.* at 746 (citing *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238

9  (1989)).  Here, there is no evidence of any "pattern" of conduct or of racketeering activity.

10       1.    <u>There Is No Evidence of a RICO "Pattern."</u>

11       While Plaintiffs allege that Fresh Start, along with other dismissed defendants, committed

12  "countless acts of mail fraud and wire fraud," (Compl. ¶ 75), they have presented evidence of *only*

13  *one* potential predicate RICO act – the telephone discussion between Carmichael and Ronald

14  McClure.  Plaintiffs alleged that Fresh Start and dismissed defendants also sent pamphlets to

15  prospective clients (Compl. ¶ 77; *see also* Ex. L at 99:9 (making oblique reference to "the

16  pamphlets")), but Plaintiffs' Rule 26 disclosures do not mention any pamphlets.  (Ex. S at pp.5-11.)

17  Their document production did not include the alleged "pamphlets."  Nor did Plaintiffs present

18  any pamphlets to Fresh Start's witnesses to be authenticated in deposition, or even ask the defense

19  witnesses about pamphlets.[7]  Despite ample opportunity to develop their "pattern" theory in

20  discovery, Plaintiffs did not even attempt to do so.  Thus, assuming Mr. Carmichael's statements

21  were false – which is not the case, *see* Sections III(B)(2), III(B)(3)(b), III(B)(5) and III(B)(7),

22  *supra* – his one conversation with Ronald cannot support a RICO claim.  *Howard*, 208 F.3d at

23  746.

24       2.    <u>There Is No Evidence of Racketeering Activity</u>

25  _____

26  [7] In their complaint, Plaintiffs referenced two documents – a flow chart and an over-forty-year-old newsletter article – in connection with their allegations that the Narconon program is "a recruiting tool for the Church of Scientology."

27  (Compl. ¶ 78 & Exs. B, C.)  As with their phantom "pamphlets," Plaintiffs made no attempt in discovery to authenticate the exhibits attached to their complaint, and thus those documents are inadmissible.

28

1    The predicate acts pled in support of their RICO claim are mail and wire fraud.  (Compl. ¶

2  75.)  Both require proof that the defendant "1) devised or intended a scheme to defraud [plaintiff],

3  and 2) used the mail or wires in executing, or attempting to execute that scheme."  *Sussex Fin.*

4  *Enterprises, Inc. v. Bayerische Hypo-Und Vereinsbank AG*, 460 Fed. App'x. 709, 712 (9th Cir.

5  2011) (affirming grant of summary judgment dismissing RICO claim; citing *Carter v. United*

6  *States*, 530 U.S. 255, 261 (2000) and *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir.

7  2010).)  The scheme to defraud must also "include an affirmative, material misrepresentation."

8  *Green*, 592 F.3d at 1064.

9    Carmichael's statements were neither false nor material.  *See* Sections III(B)(2),

10  III(B)(3)(b), III(B)(5) and III(B)(7), *supra*.  Furthermore, there is the complete absence in the

11  record of any "scheme" between Fresh Start and the dismissed defendants.  Because Plaintiffs

12  cannot establish any triable issues in connection with their fraud claim, their RICO claim,

13  predicated on the same allegations, also fails.

14    G.    Plaintiffs' Civil Conspiracy Claim Fails as a Matter of Law

15    To establish a claim for civil conspiracy, plaintiffs must prove: (1) the commission of an

16  underlying tort; and (2) an agreement between the defendants to commit that tort.  *GES, Inc. v.*

17  *Corbitt*, 21 P.3d 11, 15 (Nev. 2011).  They must also establish with specificity "'the manner in

18  which a defendant joined in the conspiracy and how he participated in it."  *Mesi v. Wash. Mut.*

19  *Home Loans, Inc.*, 2011 WL 2174967 at *3 (June 3, 2011) (quoting *Arroyo v. Wheat*, 591 F. Supp.

20  141, 144 (D. Nev. 1984)).  Plaintiffs have no evidence of these elements as the civil conspiracy

21  claim fails as a matter of law.

22    1.    Plaintiffs Cannot Establish The Necessary Tort to Underlie the Conspiracy
         Claim.
23

24    "Conspiracy is not an independent cause of action in and of itself, but must be premised on

25  an intentional tort."  *Leung v. Mortg. Electr. Reg. Sys., Inc.*, 2013 WL 237225, at *4 (D. Nev. Jan.

26  22, 2013) (citing *Eikelberger v. Tolotti*, 611 P.2d 1086, 1188 (Nev. 1980).  Plaintiffs allege two

27  bases for their conspiracy claim:  (1) "Defendants intended to act in concert to accomplish the

28  unlawful objectives of indoctrinating and recruiting Plaintiff Jason McClure into Scientology

1 | under the guise of providing him drug treatment" and (2) "Defendants further acted in concert to

2 | have non-physicians perform medical procedures on Plaintiff Jason McClure for which a medical

3 | license was required under NRS § 630.160."  (Compl. ¶¶ 86-87.)  Neither basis is sufficient to

4 | state a civil conspiracy claim.

5 |       First, attempting to convert someone is not an intentional tort; therefore, Defendants'

6 | alleged "objectives of indoctrinating and recruiting Plaintiff Jason McClure into Scientology"

7 | cannot form the basis of Plaintiffs' civil conspiracy claim.  *See Leung*, 2013 WL 237225, at *4.  In

8 | any event, the unconverted evidence demonstrates that Jason was neither "indoctrinated" nor

9 | "recruited" into Scientology.  Second, Plaintiffs' civil conspiracy claim cannot be based on an

10 | alleged violation of NRS § 630.160 because, in addition to the lack of evidence of a violation,

11 | NRS § 630.160 does not create a private right of action.  *See Lucatelli v. Texas de Brazil (Las*

12 | *Vegas) Corp.*, 2012 WL 1681394, at *4 (D. Nev. May 11, 2012) (dismissing civil conspiracy

13 | claim premised on federal statute for which there is no private right of action.

14 |       Indeed, the undisputed facts demonstrate that Plaintiffs cannot establish *any* tort

15 | whatsoever.  As proven above, all of Plaintiffs' other claims fail as a matter of law.  Accordingly,

16 | summary judgment on their civil conspiracy claim is appropriate.  *See Hansen v. Nieves*, 2010 WL

17 | 3119167, at * ___ (D. Nev. Aug. 6, 2010) ("[p]laintiffs' [sic] conspiracy claim fails because

18 | plaintiff fails to prove an underlying tort"); *see also Entm't Research Grp., Inc. v. Genesis*

19 | *Creative Grp., Inc.*, 122 F.3d 1211, 1228 (9th Cir. 1997) (affirming summary judgment on

20 | conspiracy claim after affirming summary judgment on all other tort claims, "since no underlying

21 | tort exists.").

22 |       2.   <u>The Record Contains No Evidence of Any Other Element of a Civil</u>

23 | <u>Conspiracy Claim.</u>

24 |       A claim for civil conspiracy requires the plaintiff to prove an agreement between the

25 | alleged conspirators to commit that tort, "the manner in which a defendant joined in the conspiracy

26 | and how he participated in it."  *Mesi*, 2011 WL 2174967 at *3.  "It is not enough to show that

27 | defendants might have had a common goal unless there is a factually specific allegation that they

28 | directed themselves towards this wrongful goal by virtue of a mutual understanding or

1   agreement." *Goodwin v. Exec. Trustee Srvcs., LLC*, 680 F. Supp. 2d 1244, 1254 (D. Nev. 2010)

2   (granting motion to dismiss conspiracy claim).

3        Plaintiffs have no evidence of any agreement between Fresh Start, and the dismissed

4   defendants to commit any of the torts alleged in the Complaint.  They have no facts or evidence as

5   to how Fresh Start entered into any conspiracy, nor any evidence of an intent by Fresh Start, NI,

6   and ABLE to harm Plaintiffs.  Therefore, summary judgment is necessary.  *See Guilfoyle v. Olde*

7   *Monmouth Stock Transfer Co., Inc.*, 335 P.3d 190, 199 (2014) (affirming summary judgment where

8   plaintiff presented no evidence from which to infer an agreement between the alleged conspirators

9   to harm plaintiff); *Mesi*, 2011 WL 2174967 at *3 (granting summary judgment where "there is no

10  evidence before the court that established that the defendants in this action had an agreement to

11  defraud [plaintiff]" and "no evidence establishing how moving defendants joined in any

12  conspiracy").

13       H.    <u>Plaintiffs' Consumer Fraud Claims Pursuant to NRS § 41.600 Fail</u>

14       Claims under the Nevada Deceptive Trade Practices Act (DTPA) "require[] a 'victim of

15  consumer fraud to prove that (1) an act of consumer fraud by the defendant (2) caused (3) damage

16  to the plaintiff.'"  *Sattari*, 475 Fed. App'x at 648 (quoting *Picus v. Wal-Mart Stores, Inc.*, 256

17  F.R.D. 651, 658 (D. Nev. 2009)).[8]

18       Although the complaint does not cite the specific portions of the DTPA Plaintiffs invoke,

19  in opposing Defendants' motion to dismiss, Plaintiffs clarified that their claim was brought under

20  two prongs of the DTPA:

21       Under NRS 598.0915(5) and (9), it is a deceptive trade practice if a defendant:

22      5.  Knowingly makes a false representation as to the characteristics, ingredients,
    uses, benefits, alterations or quantities of goods or services for sale or lease or a

23      false representation as to the sponsorship, approval, status, affiliation or connection
    of a person therewith (emphasis added) [sic]

24

25      9.  Advertises goods or services with intent not to sell or lease them as advertised.

26  _____

27  [8] "The Nevada Supreme Court [had] not specified the elements of a DTPA action" as of August 2014.  *Phillips v.*
    *Dignified Transition Solutions*, 2014 WL 4294972, at *3 (D. Nev. Aug. 28, 2014).  It does not appear to have issued
    any opinions citing the DTPA since that time.

28

1   (Dkt. No. 11 at 18:12-16.)  Plaintiffs further clarified that the claim is premised on the same five

2   representations underlying their fraud and negligent misrepresentation claims.  (*Id.* at 18:18-22,

3   19:1-9.)  Accordingly, Fresh Start addresses the provisions and alleged misrepresentations

4   Plaintiffs identified.  The claim fails for two reasons.

5          *First,* to prove a DTPA claim based on sections 598.0915(5) and (9), Plaintiffs must

6   provide evidence showing "a knowing misrepresentation, an intent to mislead, or a false statement

7   of fact."  *Phillips v. Dignified Trans. Solutions*, 2015 WL 5056406, at *6 (D. Nev. Aug. 25, 2015).

8   As set forth above in connection with the fraud and negligent misrepresentation claims, Plaintiffs

9   have no evidence of falsity or an intent to mislead Plaintiffs.  Therefore, their DTPA claim

10  necessarily fails.  Moreover, Jason neither heard nor relied on any representation about the

11  Narconon program.  Jason's DTPA claim fails for this additional reason.  *See Sobel v. Hertz*

12  *Corp.*, 698 F. Supp. 2d 1218, 1230-31 (D. Nev. 2010) (granting summary judgment on DTPA

13  claim where Plaintiffs "conceded at their deposition that they neither saw nor relied upon any [of

14  defendant's] advertising prior to [completing the transaction at issue]").

15         *Second,* an "advertisement" under the DTPA is defined "as an 'attempt . . . to induce,

16  directly or indirectly, any person to enter into any obligation to lease or acquire any title or interest

17  in any property."  *Wilson v. Stratosphere Corp.*, 371 Fed. App'x 810, 811 (9th Cir. 2010) (quoting

18  NRS § 598.0905) (emphasis added).  Here, Plaintiffs allege that Carmichael made representations

19  to Ronald regarding the provision of drug and alcohol rehabilitation *services*, not property.

20  Therefore, section 598.0915(9) pertaining to advertisements is not applicable, and Plaintiffs' claim

21  under this provision fails.  *See Sobel*, 698 F. Supp. 2d at 1230-31.

22         I.     Plaintiffs Cannot Recover Punitive Damages as a Matter of Law

23         None of Plaintiffs' claims can survive summary judgment.  But even if a triable issue

24  existed as to liability, Plaintiffs' demand for punitive damages must be rejected.  To recover

25  punitive damages, Plaintiffs must prove, "by *clear and convincing evidence* that the defendant has

26  been guilty of oppression, fraud or malice, express or implied."  NRS § 42.005(1) (emphasis

27  added).  "Oppression" requires proof of "despicable conduct that subjects a person to cruel and

28  unjust hardship with conscious disregard of the rights of the person."  NRS § 42.001(4).  "Malice,

1  express or implied" requires proof of "conduct which is intended to injure a person or despicable

2  conduct which is engaged in with a conscious disregard of the rights or safety of others."  NRS §

3  42.001(3).  Applying these standards, a court of this District recently granted summary judgment

4  and struck a claim for punitive damages where the plaintiff "failed to provide evidence of evil

5  motive, intent to injure, or even reckless disregard for Plaintiff's rights."  *Phillips v. Clark County*

6  *Sch. Dist.*, 903 F. Supp. 2d 1094, 1105 (D. Nev. 2012).

7          As in *Phillips*, Plaintiffs have not provided any evidence, let alone clear and convincing

8  evidence, of "evil motive, intent to injure or even reckless disregard" for their rights.  Discussing

9  the Narconon program with Ronald, without making any fraudulent statements, is not evil.  Nor is

10  there proof of an "intent to injure," particularly since the only injuries Jason alleges in this case

11  occurred after he left Fresh Start.  Likewise, Plaintiffs do not and cannot identify any evidence that

12  Fresh Start acted in reckless disregard of their rights.  Fresh Start provided Jason the secular

13  rehabilitation services it agreed to provide, and Jason voluntarily left before suffering the injuries

14  he now claims.

15  **IV.    CONCLUSION**

16          Plaintiffs lack any evidence sufficient to create a triable issue of fact as to any of their

17  claims in the case – and their own deposition admissions defeat their claims as a matter of law.

18  The Court should thus enter summary judgment in favor of Defendants.

19  DATED: October 1, 2015              LEWIS BRISBOIS BISGAARD & SMITH LLP

20                                            /s/ David B. Avakian

21                                      DAVID B. AVAKIAN
                                        Nevada Bar No. 009502
22                                      david.avakian@lewisbrisbois.com
                                        6385 S. Rainbow Boulevard, Suite 600
23                                      Las Vegas, Nevada 89118
                                        Attorney for NARCONON FRESH START
24
    DATED: October 1, 2015              SCHEPER KIM & HARRIS LLP
25
                                              /s/ David W. Williams
26                                      David W. Williams (Pro Hac Vice Pending)

27

28

4847-4379-0377.2
DEFENDANT'S NOTICE OF MOTION FOR SUMMARY JUDGMENT